Charles R. Kozak, Esq.
SBN No. 11179
Kozak & Associates, LLC
3100 Mill St., Suite 115
Reno, NV 89502
Phone: (775) 322-1239
Facsimile: (775) 800-1767
chuck@kozaklawfirm.com
*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| EMILA "EMILY" HANNAH THOMAS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>TAREK SALMAN, an individual; TARIQ KAADAN, and individual, DOES 1-50, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT**<br>   **(1) Failure to Pay Wages pursuant to NRS 608.020, 608.040, 608.050, and 608.140**<br>   **(2) Violation of the Fair Labor Standards Act (FLSA)**<br>   **(3) Breach of Contract**<br>   **(4) Breach of the Covenant of Good Faith and Fair Dealing**<br>   **(5) Battery**<br>   **(6) Negligence**<br>   **(7) Intentional Infliction of Emotional Distress**<br>   **(8) False Imprisonment**<br><br>**Jury Trial Demanded** |

COMES NOW Plaintiff, EMILY THOMAS ("Emila"), by and through her attorney of record, Charles R. Kozak, Esq. of Kozak & Associates, LLC., upon personal knowledge and upon information and belief and alleges the following:

All allegations in the Complaint are based upon information and belief except for those allegations that pertain to the Plaintiff named herein. Each allegation in the Complaint either

1

has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

**JURISDICTION AND VENUE**

1. The Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. § 1332 because the jurisdictional amount exceeds $75,000 and no plaintiff shares a state of citizenship with any defendant.

2. The Court has original jurisdiction over both state and federal claims alleged herein. The Court has original jurisdiction over the state law claims alleged herein because the amount in controversy exceeds $10,000 and a party seeking recovery of unpaid wages has a private right of action pursuant to NRS 608.020, 608.050, and 608.104. The Nevada Supreme Court has found that former employees have a private cause of action to sure their employer for wages and waiting penalties under NRS 608.040 and NRS 608.050. The Court has jurisdiction over the federal claims alleged herein pursuant to Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b).

3. Emilia is seeking to recover unpaid wages due pursuant to Nevada statutory authority and pursuant to an agreement (implied by law and fact) to pay for all hours worked and/or under the wage laws of the State of Nevada. Emilia therefore has a private right action pursuant to NRS 608.040 and 608.140.  Emilia made a proper demand for wages due pursuant to NRS 608.140 and by agreement of the parties.

4. The venue is proper for the Nevada District Court because Emilia was hired to work in the State of Nevada, the causes of action occurred in the State of Nevada, and none of the Defendants reside in the State of Nevada.

## PARTIES

5. Plaintiff Emilia "Emiliy" Hannah Thomas (hereinafter "Emilia") is natural person who is a United States Citizen, was a resident of the State of Nevada and is currently living abroad in Norway, was employed by Defendants as an hourly employee at their Burning Man Camp during the relevant time period alleged herein.

6. Above-named Defendant Tariq Mitchel Kaadan is a natural person who is and was a resident of the State of Washington, City of Redmond, King County, U.S.A.

7. Above-named Defendant Tarek Salman is a foreign national believed to be a citizen of Lebanon and domiciled at 225 Foch, Beirut, Lebanon.

8. Abovenamed Defendants John Does I-XX, inclusive are natural persons domiciled outside of the State of Nevada and foreign corporate entities.

## INTRODUCTION

9. Defendants Tariq Kaadan and Tarek Salman (collectively "Defendants") hired Emilia as a project manager for Defendants theme camp at the 2018 Burning Man Festival.

10. Defendants and Emilia agreed that her rate of pay would be $25.00 per hour for pre-festival work (July 17-August 26, 2018), $50.00 per hour for festival work (August 27-September 7, 2018.

11. Emilia's duties, either personally performed or contracted out, included:

    a. Logistical planning for vehicle transportation from California to Nevada;
    b. Merchandise purchasing, receiving and storage;
    c. Layout design;
    d. Set-up crew;
    e. Chef and menu logistics;
    f. Ticket sales;
    g. Guest transportation;
    h. Forklift operations;
    i. Thermo-insulation construction;
    j. Diesel engine maintenance;

3

      k. Recycling water and wasted;
      l. Camp community service;
      m. Kitchen manager;
      n. Liaison for outside services and Burning Man staff; and
      o. Clean-up crew.

12. Defendants theme camp consisted of a 50-person private, luxury encampment, kitchen, and sleeping areas, at the 2018 Burning Man Festival.

13. Emilia operated the camp beginning on August 26, 2018 through September 3, 2018.

14. The night of August 30, 2018, the fifth night of camp, Emilia retired to her designated "sleeping area," a small twin bed in the roof of Defendants' recreational vehicle ("RV").

15. Emilia shared the "sleeping area" with a co-worker at the camp, Louve Kolinka "LK," then 17-years-old, who is believed to reside in Paris, France.

16. At approximately 9:00 p.m., above named Defendants entered the "sleeping area" and offered Emilia and LK a sedation drug, Ketamine.

17. The women declined Defendants offer and Defendants then departed the "sleeping area."

18. Shortly after Defendants departure, LK departed the RV to return to Reno with her father.

19. After LK left the RV, Defendants returned to the "sleeping area" to talk to Emilia and to offer her water.

20. Emilia drank the water and immediately recognized the acrid taste of an unknown substance within the water. Defendants then once again offered Emilia Ketamine stating it would "help her sleep and relax."

21. Emilia felt pressure to take the Ketamine as Defendants were encroaching on her private "sleeping area."

22. Emilia felt the effects of the Ketamine immediately. She immediately began to lose the ability to move her neck, arms, and her head began spinning.

23. After Emilia lost all control of her body, Defendants began removing their pants and climbing onto the twin bed. Defendants began unprotected and unwanted vaginal intercourse with Emilia.

24. Emilia lacked the ability to protest with either her body or voice due to the Ketamine.

25.  Although Emilia suffered a horrific rape at the hands of the Defendants, she was afraid to report the men to legal authorities or leave the camp. She did not believe Defendants would pay her if she did and she needed the money owed to her for her extensive work and additional expenses.

26. On September 1, 2018, the Defendants and most of the other camp members left without completing any formal clean-up procedures as mandated in the Burning Man fine print.

27. Defendants controlled the means of transportation to and from Burning Man, effectively abandoning Emilia.

28. In addition to being abandoned, Emilia was left to clean-up, without a crew or materials. The Bureau of Land Management threatened to penalize the area, but Emilia had no way of contacting the owners of the camp, the Defendants, so she felt obligated to stay until the area met the Bureau and Festival's strict guidelines for leaving "no trace."

29. Emilia was forced to locate cleaning resources such as rakes and trash vehicles, Emilia had to pay for the camps grey water to be pumped, otherwise they were threatening to fine Emilia.

30. On September 6, 2018, Emilia was finally able to leave the Burning Man Camp.

31. Emilia was never paid for her completed work, nor was she reimbursed for expenses including pre-event housing, transportation of supplies, purchases made at Home Depot, Hertz, and Walmart.

32. Emilia requested payment on September 12, 2018, October 7, 2018, October 21, 2018, November 10, 2018, and through her attorney on July 23, 2020.

33. A few weeks after the alleged rape, Emilia began to experience the symptoms of an unknown disease.  The symptoms included open sores and irritation that lasted for 2-3 weeks.

34. In October of 2018, Emilia was seen by a gynecologist in Norway who conducted blood tests. The doctor concluded that Emilia was suffering from Herpes type 2 (HSV-2).

35.  Emilia was seen for various conditions resulting from the alleged rape by clinical psychologist, Wayne Blackburn, in May and June of 2019.

36. Emilia consulted with Dr. Kamaath at the Lynfield Medical Center in Auckland, New Zealand regarding the sexual assault.

37. On August 18, 2019, Emilia described the rape in a detailed letter addressed to Lovelock Police. Perishing County Deputy Sheriff Phillip Dickerman provided his card to Plaintiff on August 19, 2019, reflecting Perishing County Sheriff's Office Case Number 19-200.

38. Emilia has continued treatment for victims of sexual assault in Norway.

### A.  LABOR RELATED CLAIMS

**Count 1: Failure to Pay Wages pursuant to NRS 608.020, 608.040, 608.050, and 608.140**

39. Emilia realleges and incorporates by reference all the paragraphs above in the
    Complaint as thought fully set forth herein.

40. On July 16, 2018, Emilia and Defendants reached an agreement in which Emilia would organize, set-up, manage, and clean-up Defendants luxury Burning Man Camp.

41. Defendants rented 25 luxury RV's, which were filled by attendees from around the world who paid Defendants for their attendance to the private luxury camp.

42. On or about late July 2018, Emilia began to organize the camp by purchasing décor, refrigeration units, and hiring camp personnel.

43. On or about August 26, 2018, the camp officially opened for the Burning Man Festival.

44. Emilia worked every day between August 26, 2018 and September 3, 2018, often without any 10-minute rest breaks or 30-minute meal breaks.

45. Emilia often worked in excess of 12 hours a day, without being paid overtime wages.

46. On August 30, 2018, Defendants departed their Burning Man Camp, leaving Emilia alone to clean-up the camp. Prior to their departure, they once again agreed to pay Emilia via electronic transfer.

47. Emilia spent the next three days cleaning the camp and returning equipment to storage in Nevada.

48. On September 12, 2018, Emilia contacted Defendants requesting payment.  Defendants, specifically Tarek Salman, refused to pay her citing that a generator was not returned on time as their reason.

49. ***Emilia has not received any payments to date***, in clear violation of NRS 608.020, which states: "Whenever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

50. NRS 608.140 provides that an employee had a private right of action for unpaid wages: "Whenever a mechanic, artisan, miner, laborer, servant or employee shall have cause to bring suit for wages earned and due according to the terms of his or her employment, and shall establish by decision of the court or verdict of the jury and amount for which he or she has brought suit is justly due, and that a demand has been made, in writing, at least 5 days before suit was brought, for a sum not to exceed the amount so found due, the court before which the case shall be tried shall allow to the Plaintiff a reasonable attorney fee, in addition to the amount found due for wages and penalties, to be taxed as costs of suit." Plaintiff has made a demand for unpaid wages upon Defendant pursuant to NRS 608.140, but satisfactory payment was not received.

51. NRS 608.016 states that "An employer shall pay to the employee wages for each hour the employee works." Hours worked means any time the employer exercises "control or custody" over an employee. *See* NRS 608.11 (defining an "employer" as "every person having control or custody… of any employee). Pursuant to Nevada Administrative Code, hours worked includes "all time worked by the employee at the direction of the employer, including time worked by the employee that is outside the scheduled hours of work of the employee." NAC 608.115(1).

52. NRS 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

53. NRS 608.040(1)(a-b), in relevant part, imposes a penalty on an employer who fails to pay a discharged or quitting employee: "Within 3 days after the wages or compensation of a discharged employee becomes due; or on the day the wages or compensation is due

to an employee or resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30-days, whichever is less."

54. Emilia is further entitled to an additional 30-days of pay pursuant to NRS 608.050; which, states:

> "Whenever an employer of labor shall discharge or lay off employees without first paying them the amount of any wages or salary then due them, in cash and lawful money of the United States, or its equivalent, or shall fail, or refuse on demand, to pay them in like money, or its equivalent, the amount of any wages or salary at the time the same becomes due and owing to them under their contract of employment, whether employed by the hour, day, week or month, each of the employees may charge and collect wages in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default."

55. Porteous v. Capital One Services II, LLC, 809 Fed. Appx. 354, (9th Cir. 2020) reviewed this issue pertaining to this first cause of action and determined that "Plaintiff has plausibly alleged claims under …. NRS 608.020-NRS 608.050. The Nevada Supreme Court has clearly interpreted NRS 608.016 and 608.018 to authorize a private right of action, and Plaintiff's claims under NRS 608.020 and NRS 608.050 are derivatives thereof. *See* Neville v. Eighth Judicial Dist. Court, 133 Nev. 777, 406 P.3d 499, 501–04 (2017). "[W]e are bound to follow the decisions of a state's highest court in interpreting that state's law." Olympic Sports Prods., Inc. v. Univ. Athletic Sales Co, 760 F.2d 910, 913 (9th Cir. 1985); *see also* Knievel v. ESPN, 393 F.3d 1068, 1072–73 (9th Cir. 2005). The complaint plausibly alleges that Plaintiff worked hours for which she should have been but was not paid, *see* NRS 608.016, that she worked hours for

which she was legally entitled to but did not receive overtime compensation, *see* NRS 608.018, and that these wages earned and owing remain unpaid after termination of service, *see* NRS 608.020 and NRS 608.050. *See Starr*, 652 F.3d at 1216."

56. Wherefore, Emilia demand for herself payment by Defendant at the regular hourly rate of pay for all hours worked during the relevant time period together with attorneys' fees, costs, and interest provided by law.

**Count 2: Violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207 and NRS 608.018(1)(2)**

57. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

58. 29 U.S.C. Section 207(a)(1) provides as follows: "Except as otherwise provided in the section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of good for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular ate at which he is employed."

59. By failing to compensate Emilia for time spent working in Defendants' camp over and above forty hours per week, Defendants failed to pay Emilia overtime for all hours worked in excess of forty (40) hours in a week in violation of 29 U.S.C. Section 207(a)(1).

60. NRS 608.018(1) provides as follows:

An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than

10

    1 1/2 times the minimum rate set forth in NRS 608.250 works:
(a) More than 40 hours in any scheduled week of work; or
(b) More than 8 hours in any workday unless by mutual agreement the employee works a scheduled 10 hours per day for 4 calendar days within any scheduled week of work.

61. NRS 608.018(2) provides as follows:

    An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate not less than 1 1/2 times the minimum rate set forth in NRS 608.250 works more than 40 hours in any scheduled week of work.

62. By failing compensate Emilia for time spent working in camp over and above forty hours per week, Defendants failed to pay Emilia overtime for all hours worked in excess of forty (40) hours in a week in violation of NRS 608.018(1)(2).

63. Defendant's unlawful conduct was widespread, repeated, and willful. Defendants knew or should have known that its policies and practices were unlawful and unfair.

64. Wherefore, Emilia demand for herself, that Defendants pay Emilia one and one-half times her regular hourly rate of pay for all hours worked in excess of forty (40) hours a week during the relevant time period together with liquidated damages, attorney's fees, costs, and interest provided by law.

**B. CONTRACTUAL CLAIMS**

Emilia provided services including housing accommodations, culinary duties, and cleaning for Defendants during the 2018 Burning Man festival.

    i. *Pre-Festival Work*

        1. Emilia began work for Defendants on July 17, 2018.

        2. Emilia's title was Project Manager

        3. Emilia provided extensive planning and logistical services before the festival including procurement of goods, transportation of individuals and art.

11

4. Her pre-festival work included the design and setup of weeklong Burning Man camp such as water systems for grey and fresh water, electricity and power system, food refrigeration kitchen with chef, furniture, and lighting,
   a. For example, Emilia contracted with non-party Sarah Brewer to work full time as Camp Chef.
   b. For example, on or about July 17, 2018, Emilia advanced approximately $8,121.93 in costs to Defendants for the purchase of a semi-trailed and refrigeration unit from Thermo King Fresno, Inc., a California corporation,
   c. For example, via email on August 3, 2018, Emilia proffered appliances needed at the festival encampment including an ice machine, deep freezer, and oven.
   d. For example, via email on August 16, 2018, Emilia tendered to above named Defendant Tarek Salman various decorations and home goods exemplifying a potential theme or motif for the encampment.
5. Also, on August 16, 2018 via email, above named Defendant Tarek Salman approved of Emilia's selection of "drapes, carpet, low seating, patterns etc…" Salman summarized, "Everything looks great to me."
6. Emilia performed pre-festival, contractual obligations.

ii. *Operating the Encampment during the Festival*

7. During the festival, Emilia operate the 50-person luxury encampment.
8. Emilia's responsibilities included food service, maintenance of water, system, maintenance of electrical and power systems, and management of other staff.

12

    9. Emilia performed contractual obligations during the festival.

 iii. <u>Post-festival Work</u>

   Emilia continued to work post-festival through September 9, 2018.

   1. Her post-festival work included:

    a. Three days of cleaning as well as procurement of tools such as rakes and trash vehicles for same.

    b. compliance with Bureau of Land Management requirements.

   2. Emilia upheld her contractual duties.

   3. On October 7, 2018, Defendant Tarek Salman stated via email to Plaintiff, "You were the best person at camp. Always working your ass off and trying to make things better for everyone."

 iv. <u>Defendants' Breach their Contractual Obligation to Pay</u>

   Via email On October 9, 2018 Plaintiff requested Defendants negotiate an agreement for payment.

   1. On October 21, 2018, Emilia itemized unpaid wages and expenses totaling $18,722.00 and including:

    a. Wages
    b. Forklift fee
    c. Transportation fees
    d. Water fees and container costs
    e. Kitchen shelving
    f. Table used for DJ equipment
    g. Vinyl tarp used for wind protection
    h. Loading bars

65. On October 17, 2018, via email, Defendant Tarek Salman offered to wire an additional $4000 to Emilia for services rendered. To Defendants have failed to send Emilia any amount of money.

13

**Count 2: Breach of Contract**

66. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

67. On or July 16, 2018, the parties reached an agreement via text message communication.

68. The parties agreed Emilia would be employed as Project Manager and would receive $25.00 per hour for pre-festival work and $50.00 per hour for festival work.

69. Broadly, the parties agreed Emilia would build a camp for host Defendants at the 2018 Burning Man festival.

70. In consideration therefore, Defendants would pay Emilia certain sums (i.e. $25.00 per hour for pre-festival work, $50.00 per hour for festival work, and reimbursement for expenses that Emilia paid on their behalf with her own money).

71. In breach of the agreement, Defendants have not paid Emilia any money pursuant to their agreement.

72. Above named Defendants' said conduct caused plaintiff's direct and consequential damages in excess of jurisdictional limits including payment of wages, pain and suffering, the loss of a subsequent project, and non-refundable airline tickets.

73. Above named Defendants' said conduct was the actual and proximate cause of plaintiff's direct and consequential damages.

**C. TORT CAUSES OF ACTION**

**Count 3: Breach of the Covenant of Good Faith and Fair Dealing**

74. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

75. Defendants entered into a contract in which Emilia would perform certain functions related to setting up Defendants Burning Man Camp, managing the camp, providing culinary and clean-up at the conclusion of camp.

76. By failing to pay Emilia the agreed upon amount and reimbursement for camp expenses, Defendants failed to perform their contractual obligations honestly, fairly, and in good faith.

77. Defendants' quickly left their camp and Emilia behind to continue their party at Lake Tahoe.  This course of performance destroyed Emilia's right to receive the benefit of the contract.

78. Defendants breached the duty of good faith and fair dealing by engaging in misconduct.

79. Above named Defendants' said conduct was the actual and proximate cause of Emilia's direct and consequential damages.

### Count 4: Battery

80. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

81. The night of August 30, 2018, Emilia retired to her designated accommodation within defendants' recreational vehicle.

82. Defendants were the owners and/or occupants of the recreational vehicle.

83. The vehicle was within defendants' control at all relevant times.

84. The vehicle was Emilia's designated accommodation during the festival.

85. On the night of August 30, 2018, Defendants intentional made unwanted sexual contact with Emilia.

86. Above named Defendants' said conduct caused Emilia's direct and consequential damages in excess of jurisdictional limits.

87. Above named Defendants' said conduct was the actual and proximate cause of Emilia's direct and consequential damages.

### Count 5: Negligence

88. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

89. Above named Defendants owed a duty of ordinary care to Emilia.

90. Above named Defendants owed a statutory duty to Emilia. Specifically, NRS 200.366. prohibits a person from subjecting another person to sexual penetration.

91. Plaintiff is the type of person NRS 200.366 intends to protect.

92. Above named Defendants owed a second statutory duty to Emilia. Specifically, NRS 41.130.

93. In violation of statute, above named defendants raped Emilia.

94. Above named Defendants said conduct constitute wrongful acts.

95. Above named Defendants' said conduct caused Emilia's direct and consequential damages in excess of jurisdictional limits.

96. Above named Defendants' said conduct was the actual and proximate cause of Emilia's direct and consequential damages.

### Count 6: Intentional Infliction of Emotional Distress

97. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

98. Defendants' rape of Emilia was extreme and outrageous conduct.

99. Emilia suffered extreme or severe emotional distress as a result of her rape.

100. Defendants intentional, unwanted sexual contact caused Emilia's emotional distress

101. Defendants caused Emilia's emotional distress through their own reckless disregard.

102. Above named Defendants' said conduct caused Emilia's direct and consequential damages in excess of jurisdictional limits.

103. Above named Defendants' said conduct was the actual and proximate cause of Emilia's direct and consequential damages.

### Count 7: False Imprisonment

104. Emilia realleges and incorporates by reference all the paragraphs above in the Complaint as thought fully set forth herein.

105. Upon information and belief, Defendants knew or should have known that Ketamine is used to induce loss of consciousness, or anesthesia. It induces a trance-like state while providing pain relief, sedation, and memory loss.

106. When Defendants laced Emilia's water with Ketamine and then insisted that she ingest additional Ketamine, Defendants intended to confine and subdue Emilia on the bad of the "sleeping area."

107. Defendant's acts directly or indirectly resulted in such a confinement of Emilia and made it impossible for her to escape their intentions; and

108. Emilia was conscious of the confinement and was harmed by it.  The confinement lead to her sexual assault and sexually transmitted life-long disease. Hernandez v. City of Reno, 97 Nev. 429, 634 P.2d 668 (1981).

109.　As a result of Defendant's heinous acts, Emilia has suffered from feelings of humiliation, indignity and disgrace to person, and physical and mental suffering. Emilia is entitled to damages. <u>Hall v. SSF, Inc.</u>, 112 Nev. 1384, 930 P.2d 94 (1996); <u>Lerner Shops of Nev., Inc. v. Marin</u>, 83 Nev. 75, 423 P.2d 398 (1967).

110.　Emilia is also entitled to future pain and suffering arising from the sexual assault and sexually transmitted life-long disease, HSV-2. <u>Paul v. Imperial Palace, Inc.</u>, 111 Nev. 1544, 908 P.2s 226 (1995). <u>K-Mart Corporation v. Washington</u>, 109 Nev. 1180, 866 P.2d 274 (1993).

## **DEMAND**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment for Plaintiff and against Defendant, awarding the following:

1. Damages in an amount to be proven at trial which exceeds $75,000;

2. Punitive damages as alleged;

3. The amount corresponding with Plaintiffs pain and suffering;

4. Prejudgment and post-judgment interest at the highest lawful rates;

5. Attorneys' fees and costs as permitted by law; and

6. Such other relief as this Court deems appropriate.

Dated this 31st day of July 2020.　　　　　Respectfully submitted

　　　　　　　　　　　　　　　　　　　　　By: /s/ Charles R. Kozak, Esq.
　　　　　　　　　　　　　　　　　　　　　　　CHARLES R. KOZAK, ESQ.
　　　　　　　　　　　　　　　　　　　　　　　(SBN No. 11179)
　　　　　　　　　　　　　　　　　　　　　　　KOZAK LAW, LLC
　　　　　　　　　　　　　　　　　　　　　　　3100 Mill St., Suite 115
　　　　　　　　　　　　　　　　　　　　　　　Reno, NV 89502
　　　　　　　　　　　　　　　　　　　　　　　Phone: (775) 322-1239
　　　　　　　　　　　　　　　　　　　　　　　Facsimile: (775) 800-1767
　　　　　　　　　　　　　　　　　　　　　　　chuck@kozaklawfirm.com
　　　　　　　　　　　　　　　　　　　　　　　*Attorney for Plaintiff*